

**SIGNED this 23rd day of March, 2012**

Marcia Phillips Parsons
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re

APPALACHIAN OIL COMPANY, INC.,

     Debtor.

No. 09-50259
Chapter 11

APPALACHIAN OIL COMPANY, INC.,

   Plaintiff,

vs.

TENNESSEE EDUCATION LOTTERY
CORPORATION,

   Defendant.

Adv. Pro. No. 10-5067

## M E M O R A N D U M

APPEARANCES:

Mark S. Dessauer, Esq.
Hunter, Smith & Davis
Post Office Box 3740
Kingsport, Tennessee 37664
*Attorney for Plaintiff*

William F. McCormick, Esq.
Tennessee Attorney General's Office
Post Office Box 20207
Nashville, Tennessee 37202
*Attorney for Defendant*

**Marcia Phillips Parsons, United States Bankruptcy Judge.**  This is an action pursuant to 11 U.S.C. §§ 547(b) and 550(a) to avoid and recover certain alleged preferential transfers totaling $526,790.68 made by the debtor Appalachian Oil Company, Inc. ("APPCO") to Tennessee Education Lottery Corporation ("TEL").  Presently before the court is TEL's motion for summary judgment based on its contention that the transfers constituted trust funds and therefore were not property of the debtor, a necessary element of § 547(b).  APPCO opposes the motion and contends, to the contrary, that it is entitled to partial summary judgment on its claim because the transfers were property of the debtor.  As discussed hereafter, both motions will be granted in part and denied in part.  This is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(F).

I.

On February 9, 2009, APPCO filed a voluntary petition for bankruptcy relief under chapter 11 and thereafter on August 9, 2010, initiated this adversary proceeding.  In its complaint as amended, APPCO states that it operated approximately 57 convenience stores in Tennessee, Virginia, and Kentucky at the time of its bankruptcy filing.  At its Tennessee stores, APPCO was an authorized seller of Tennessee lottery tickets.  According to APPCO, the general practice for payment of these tickets was that each week TEL would issue an invoice to APPCO for amounts due that week for lottery tickets sold online and for instant tickets that APPCO had held for more than 21 days after activation and then sweep APPCO's designated bank account to receive payment of the invoice by electronic funds transfer ("EFT").  Pursuant to this arrangement, during the 90 days prior to APPCO's bankruptcy filing, TEL received six EFT payments totaling $229,155.81 between November 13, 2008, and December 16, 2008.  Also during the same 90 day period, on December 28 and 30, 2008, and January 6, 2009, TEL attempted additional EFT sweeps in the amounts of $29,061.42, $51,658.85 and $216,864.60 respectively, but all were ineffective because APPCO did not have sufficient funds in its account.  Because of these insufficiencies, TEL terminated APPCO's ability to sell lottery tickets, and by December 30, 2008, had seized all unsold lottery tickets in APPCO's possession.  Thereafter, on January 8, 2009, TEL sent APPCO a letter demanding immediate payment of $297,634.87.  In response, APPCO wired TEL $50,000 on January 9, 2009, and $247,634.87 on January 12, 2009.  It is these two wire amounts, plus the six prior EFT sweeps totaling $229,155.81, that APPCO seeks to avoid and recover in this adversary proceeding as

preferential transfers.

      In moving for summary judgment on APPCO's complaint as amended, TEL states that it is a quasi-governmental corporation, established in 2003 under Tennessee law for the operation of a state lottery, with its tickets being sold in 4,700 business locations across the state.  According to TEL, APPCO became an authorized seller of Tennessee lottery tickets in its 24 Tennessee stores on November 19, 2003, when it entered into a retailer contract with TEL, under which the parties continually operated until APPCO's bankruptcy filing.  TEL asserts that this retailer contract, the Retailer Rules and Regulations incorporated by the contract, and Tennessee statutory law created an express trust in the proceeds from the sale of lottery tickets as recognized by the Honorable Richard Stair, Jr. in *Tennessee Education Lottery Corp. v. Cooper (In re Cooper)*, 430 B.R. 480, 497-98 (Bankr. E.D. Tenn. 2010).

      TEL further asserts that these same provisions required APPCO to make daily deposits of proceeds from the sale of lottery tickets into a separate trust account established for the benefit of TEL, and that APPCO in fact set up the requisite trust account at Branch Banking & Trust ("BB&T"), account no. 930,  under the name of "Appalachian Oil Company Inc. in trust for the TN Education Lottery Corporation."  TEL concedes, however, that APPCO failed to make the required daily deposits into the established trust account.  Rather, APPCO's practice, unbeknownst to TEL, was to make nightly deposits of all revenues from each store, including its lottery ticket proceeds, into a local APPCO bank account, or with respect to some stores, into one of APPCO's bank accounts at BB&T other than the trust account.  Then every day or every other day, deposits from these local accounts were swept into APPCO's master account at BB&T, account no. 957.   From this master account, APPCO regularly paid its vendors and creditors.  When TEL would present its weekly EFT draft to APPCO's trust account for payment of the lottery invoice due that week, funds from APPCO's master account were automatically transferred to the trust account, if there were sufficient funds in the master account to cover the draft.  In other words, no funds were maintained in the trust account.  Instead, the trust account kept a zero balance until a draft was made on the account, with funds flowing into the account in an amount necessary to satisfy the draft.  Moreover, the evidence indicates that APPCO not only used the Tennessee Lottery trust account for its electronic payments to TEL, but also to make required payments to the Kentucky and Virginia state

lotteries.  Consequently, all three state lotteries would perform weekly EFT sweeps of the Tennessee Lottery trust account for payment of their particular invoices, which sweeps triggered automatic transfers from APPCO's master account to the trust account in amounts sufficient to pay the drafts. The first six payments by APPCO to TEL, which APPCO now seeks to recover as preferential, were made in this fashion.  However, the last two alleged preferential payments, which APPCO wired to TEL in January 2009 after TEL had sent a demand letter, were not from the trust account or APPCO's master account.  Rather, the wired payments were from a third account of APPCO's at BB&T, account no. 353, a business checking account.

TEL argues that notwithstanding APPCO's failure to segregate proceeds from the sale of Tennessee lottery tickets from APPCO's other funds, the proceeds constituted trust funds.  TEL further argues that APPCO's transfers to it constituted payment of these trust funds, citing *Begier v. Internal Revenue Service*, 496 U.S. 53, 110 S. Ct. 2258 (1990), for the proposition that a voluntary payment of trust funds establishes the necessary nexus between collected trust funds and payment of those trust funds.  TEL maintains that all of the alleged preferential payments by APPCO to TEL were voluntary, including the two wired payments, because APPCO performed the wiring and because wiring is an authorized method of payment under the Tennessee Lottery Rules and Regulations.

In response to these arguments, APPCO does not deny that the parties' retailer contract and applicable provisions of Tennessee law purport to create a trust in proceeds from the sale of lottery tickets.  APPCO argues, however, that a trust was not created or, at a minimum, was destroyed because APPCO failed to segregate the ticket sale proceeds.  Consequently, maintains APPCO, no fiduciary relationship was ever created, and the parties' relationship was reduced to the ordinary contractual one of debtor and creditor.  Alternatively, APPCO argues that even if a trust was created in the proceeds, there is no evidence that the payments made to TEL were traceable to the trust proceeds.  In this respect, APPCO seeks to limit *Begier* to its facts, and relies on the Sixth Circuit Court of Appeals' decision in *First Federal of Michigan v. Barrow*, 878 F.2d 912 (6th Cir. 1989), for the proposition that tracing is required to avoid preferential exposure even in the context of a trust.  Lastly, and specifically as to the two wired payments, APPCO notes that prior to those transfers, TEL had terminated APPCO's ability to sell lottery tickets and had retrieved all unsold

4

tickets, actions which according to APPCO terminated any trust relationship that may have previously existed between the parties since a trust cannot exist without a trust res. Alternatively, APPCO argues that the wire transfers were outside of the parties' trust relationship, because they were made from an account other than the trust account.

II.

Rule 56(a) of the Federal Rules of Civil Procedure, applicable in adversary proceedings by virtue of Rule 7056 of the Federal Rules of Bankruptcy Procedure, states in part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, the court does not weigh the evidence to determine the truth of the matter asserted but simply determines whether a genuine issue for trial exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). The moving party bears the burden of proving that, based upon the record presented to the court, there is no genuine dispute concerning any material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986); *Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484, 491 (6th Cir. 2001). The burden then shifts to the nonmoving party to come forward with specific facts showing a genuine issue for trial. *Merriweather v. Zamora*, 569 F.3d 307, 313 (6th Cir. 2009). Reliance solely on allegations or denials contained in the pleadings or a "mere scintilla of evidence in support of the nonmoving party will not be sufficient." *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986). The facts and all resulting inferences are viewed in a light most favorable to the nonmovant, and the court decides whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 474 U.S. at 587 (citations omitted).

5

III.

Subject to certain inapplicable limitations, § 1107(a) of the Bankruptcy Code permits a chapter 11 debtor in possession such as APPCO to exercise the rights of a bankruptcy trustee under the Code. *See* 11 U.S.C. § 1107(a). These rights include the ability of a trustee under § 547(b) to avoid a transfer of an interest of the debtor:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). As set forth in the prefatory clause of § 547(b), to be subject to avoidance, the transfer must be a transfer of property of the debtor.

As previously noted, the sole question which forms the basis of both TEL's motion for summary judgment and APPCO's responsive motion for partial summary judgment is whether the transfers in question were transfers of the debtor's property. With respect to this phrase, the Bankruptcy Appellate Panel for the Sixth Circuit has stated the following:

Although the Bankruptcy Code does not define "property of the debtor," the Supreme Court has found that the term is "best understood as that property that would have been part of the estate had it not been transferred [by the debtor] before the commencement of bankruptcy proceedings." *Begier v. IRS*, 496 U.S. 53, 58, 110 S. Ct. 2258, 2263 (1990). "In defining 'an interest of the debtor in property' the Sixth Circuit looks to 11 U.S.C. § 541(a)(1), which provides that the property of the estate includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *Spradlin v. Jarvis ( In re Tri-City Turf Club, Inc.)*, 323

6

F.3d 439, 443 (6th Cir.2003) (citing *Stevenson v. J.C. Bradford & Co. (In re
Cannon)*, 277 F.3d 838, 849 (6th Cir. 2002)).  In addition, in the absence of
controlling federal bankruptcy law, the substantive nature of the debtor's property
interest is defined by state law.  *Id.* (citing *In re Cannon*, 277 F.3d at 849; *Jenkins
v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 596 (5th
Cir.1996)).

Moreover, pursuant to 11 U.S.C. § 541(d), "property of the estate" includes
all property to which the debtor holds legal title, except "to the extent of any
equitable interest in such property that the debtor does not hold."  "Because the
debtor does not own an equitable interest in property he holds in trust for another,
that interest is not 'property of the estate.'  Nor is such an equitable interest 'property
of the debtor' for purposes of § 547(b)."  *Poss v. Morris (In re Morris)*, 260 F.3d
654, 670 (6th Cir. 2001) (quoting *Begier*, 496 U.S. at 59, 110 S. Ct. at 2258).

*Meoli v. Kendall Elec., Inc. (In re R.W. Leet Elec., Inc.)*, 372 B.R. 846, 852-853 (B.A.P. 6th Cir.
2007).

Judge Stair of this district held in *Cooper* that the statutory, regulatory, and contractual
scheme provided by Tennessee law, the Tennessee Lottery Rules and Regulations, and a retailer
application and contract created an express trust in proceeds from the sale of Tennessee lottery
tickets.  *See In re Cooper*, 430 B.R. at 497-98.  In reaching this conclusion, the court observed that
the essential elements of an express trust under Tennessee law are: "(1) a trustee who holds trust
property and who is subject to the equitable duties to deal with it for the benefit of another; (2) a
beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his
benefit; and (3) identifiable trust property."  *Id.* at 494 (citations omitted); *see also Louisiana Lottery
Corp. v. CIT Group Bus. Credit, Inc. (In re E-Z Serve Convenience Stores, Inc.)*, No. 03-9018, 2004
WL 385040, *3 (Bankr. M.D.N.C. Feb. 20, 2004) (Referencing the Restatement (Second) of Trusts
§ 2, the court observed that, "[a] trust requires three basic elements: (1) identification of trust
property known as the res; (2) a fiduciary relationship between the trustee to deal with the trust res
for the benefit of the beneficiary; and (3) the manifestation of an intent to create a trust.").

Applying these requirements to the facts before him, Judge Stair concluded:

[A]n express trust was created between the Plaintiff and the Defendant by virtue of
Tenn. Code Ann. § 4–51–120, the Retailer Contract, the Retailer Application, and
the Retailer Rules and Regulations.  First, the statute defines the identifiable trust res:
all proceeds from the sale of lottery tickets or shares, including unsold instant tickets
in the retailer's possession and cash proceeds of the sale of any lottery product, less

allowable sales commissions and cash prizes awarded to purchasers, which, pursuant to Tenn. Code Ann. § 4–51–111(a)(1), are property of the Plaintiff and which "shall constitute a trust fund until paid to the corporation either directly or through the corporation's authorized collection representative." Tenn. Code Ann. § 4–51–120(a). Similarly, the Retailer Contract expressly identifies as the trust fund res "all Instant Tickets accepted from the TEL or its distributor, as well as cash proceeds from the sale of any lottery products," and states that "[a]ll proceeds from the sale of lottery Tickets and all other funds due the TEL shall constitute a trust fund in favor of the TEL until paid to the TEL."  Finally, the Retailer Rules and Regulations likewise state that all proceeds from the sale of tickets and other funds due the TEL "shall constitute a trust fund in favor of the TEL until paid to the TEL, and such proceeds are required by law to be deposited daily into the separate bank account no later than the close of the next banking day after the date of their collection by the Retailer." Retailer Rules and Regulations at ¶ 2.12.A.

        The Retailer Contract additionally establishes the Defendant as trustee and the Plaintiff as beneficiary, setting forth the following duties by the Defendant: (1) requiring the creation and maintenance of a separate bank account in his business's name "as Trustee for the Tennessee Education Lottery Corporation"; (2) requiring the Defendant to make daily deposits of all lottery sales proceeds into the separate bank account; (3) requiring the Defendant to authorize the Plaintiff access to the separate account through electronic funds transfer; and (4) ensuring that the account funds are in the account for access by the Plaintiff, all of which are reiterated in the Retailer Rules and Regulations and are authorized by Tenn. Code Ann. § 4-51-120(b)(1). Retailer Rules and Regulations at ¶ 2.12.A

*In re Cooper*, 430 B.R. at 497-99 (citations to complaint omitted).

        *Cooper* arose in the context of a nondischargeability proceeding under § 523(a)(4) of the Bankruptcy Code rather than a determination of property of the estate under § 541.  Nonetheless, its thorough conclusion regarding the creation of an express trust appears to be equally applicable to the case at hand, as the retailer contract in both cases, at least as to the pertinent provisions cited, appear identical.[1]  Further, the relevant provisions of the Tennessee statutes, Tenn. Code Ann. §§

---

        [1] In Paragraph 1 of the retailer contract, APPCO agreed to comply with the Rules and Regulations of TEL and the Tennessee Lottery for Education Act.  Additionally, paragraph 5 states the following:

        <u>Electronic Funds Transfer.</u> Retailer shall have a fiduciary duty to preserve and account for all proceeds from the sale of lottery Tickets collected by it and shall be responsible and liable for all such proceeds.  All proceeds from the sale of lottery Tickets and all other funds due the [TEL] shall constitute a trust fund in favor of the

(continued...)

4-51-111 and 4-51-120,[2] and the Tennessee Retailer Rules and Regulations, remain unchanged. Accordingly, this court agrees that the parties' retailer contract and Tennessee law established an express trust in proceeds from the sale of lottery tickets and unsold lottery tickets in the possession of APPCO as a Tennessee retailer.[3]

---

[1](...continued)
[TEL] until paid to the [TEL]. Subject to the Act and the Rules and Regulations, Retailer agrees (i) to maintain for the purpose of this Retailer Contract a separate bank account in the name of the Retailers as "Trustee for the Tennessee Lottery Corporation," with a bank acceptable to [TEL] which is a member of an automated clearing house association; (ii) to deposit daily into that bank account all proceeds from the sale of lottery Tickets and other funds due the [TEL]; (iii) to authorize [TEL] to initiate Electronic Funds Transfer (EFT) to and from that account for the net settlement due from the sales of [TEL] lottery Tickets; and (iv) that sufficient funds shall be available in the designated account on the dates specified by [TEL] to cover the amounts due [TEL], as determined by [TEL].

[2] Tenn. Code Ann. § 4-51-111(a) states that: "All lottery proceeds shall be property of the corporation [TEL]." Additionally, Tenn Code Ann. § 4-51-120(a) provides:

All proceeds from the sale of the lottery tickets or shares shall constitute a trust fund until paid to the corporation either directly or through the corporation's authorized collection representative. A lottery retailer and officers of a lottery retailer's business shall have a fiduciary duty to preserve and account for lottery proceeds and lottery retailers shall be personally liable for all proceeds. Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of the sale of any lottery products, net of allowable sales commissions and credit for lottery prizes sold to or paid to winners by lottery retailers. Sales proceeds and unused instant tickets shall be delivered to the corporation or its authorized collection representative upon demand.

[3] The parties in this case focused their arguments on whether an express trust was created. However, the Sixth Circuit Court of Appeals has recognized that "[s]tatutory trust funds are not the property of the debtor and are not subject to the . . . preference (§ 547) provisions of the new [Bankruptcy] Act." *Selby v. Ford Motor Co.*, 590 F.2d 642, 649 (6th Cir. 1979). Therefore, even if the contractual and regulatory scheme in this case did not create an *express* trust, the existence of a *statutory* trust would be sufficient to exclude the trust res from property of the debtor for purposes of §§ 541 and 547(b). The Sixth Circuit has not defined statutory trusts, other than to note that they arise automatically, without notice of filing. *Id.* at 645. The Restatement (Second) of Trusts suggests simply that they are created by statute, while an express trust is created "only if the settlor manifests an intention to create a trust." Restatement (Second) of Trusts § 23 cmt. c (2011).

As previously noted, APPCO maintains that, notwithstanding the *Cooper* decision, the express trust provided for in APPCO's retailer contract with TEL and under Tennessee law never arose or was destroyed because APPCO failed to segregate the ticket sale proceeds from its other funds and failed to use the trust account exclusively for Tennessee lottery proceeds. APPCO cites no authority for the argument in its brief, other than the conclusory statement that "it is axiomatic that a party such as APPCO cannot be deemed a fiduciary or the trustee of [a] trust when the requisite elements necessary to create the trust were never established from the inception of the purported trust."

Contrary to this assertion, however, the requisite elements of a trust were established. As previously noted, Tennessee law requires three elements: a trustee with certain equitable duties; a beneficiary to whom those duties are owed; and identifiable trust property. *In re Cooper*, 430 B.R. at 494. Each of these three elements existed herein. The retailer contract designated APPCO as trustee and TEL as beneficiary, and set forth the duties required of APPCO as trustee. Tennessee law defines the trust res as proceeds from the sale of the lottery tickets, plus all unsold tickets in the possession of the retailer. *See* Tenn. Code Ann. § 4-51-120(a) ("Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of the sale of any lottery products, net of allowable sales commissions and credit for lottery prizes sold to or paid to winners by lottery retailers."). Once APPCO came into possession of lottery tickets, the trust arose in accordance with the previously executed retailer contract and Tennessee law because the third and last required trust element, identifiable trust property, was then satisfied. *See Cumberland Surety Ins. Co. v. Smith (In re Smith)*, 238 B.R. 664, 672 (Bankr. W.D. Ky. 1999) (Citing the Restatement (Second) of Trusts § 26, the court stated "even if a trust is not immediately created due to its subject matter not being definite or definitely ascertainable, the trust may still subsequently arise when its subject matter does become definite or definitely ascertainable. What is required is the continued existence of the other three requirements at the time the trust property does become ascertainable."). As stated by Judge Stair in *Cooper*:

> The trust res–inclusive of proceeds and unsold tickets–was clearly created at the time the Defendant created the bank account and when he accepted the tickets from the Plaintiff to be held "in trust." At that moment, under Tennessee law, the Defendant, as trustee, held legal title to the unsold lottery tickets he possessed and the lottery ticket sale proceeds he was to receive, even though equitable title

10

remained in the Plaintiff.  There can be no question that the parties intended to create
a trust account into which the Defendant was required to deposit the lottery ticket
sale proceeds received and collected by him but belonging to the Plaintiff, and his
duty to pay over the proceeds to the Plaintiff arose upon his receipt of the lottery
tickets.

*In re Cooper*, 430 B.R. at 499.

The fact that APPCO subsequently failed to segregate the TEL trust funds and commingled
them with its own funds does not destroy the previously established trust or the parties' fiduciary
relationship.  *See Gowan v. The Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 419 (Bankr.
S.D.N.Y. 2011) ("It is black letter law that the commingling of funds in a trust account does not
destroy or alter the nature of the deposited funds."); 76 Am. Jur.2d *Trusts* § 287 (2012) ("As a
general rule, the commingling of trust funds with other funds does not destroy the identification of
the trust funds.").  Nor is the court persuaded that APPCO's use of the Tennessee Lottery trust
account to pay other state lotteries destroyed TEL's trust.  Because the trust was a zero balance
account, funds flowed through the account only in response to an EFT sweep by a particular state
lottery such that the funds were not commingled in the account.  While APPCO's practice was
contrary to the terms of the Retailer contract and state regulations, no authority supports the
proposition that APPCO's conduct in this regard destroyed the trust.  Accordingly, the ticket
proceeds that comprised TEL's trust res maintained their trust nature despite APPCO's handling of
the funds.

The court turns next to APPCO's argument that the wired payments made on January 9 and
12, 2009, could not constitute transfers of trust funds because: (1) the trust relationship terminated
prior to these transfers when TEL canceled APPCO's ability to sell lottery tickets and retrieved all
unsold tickets; and (2) the wired transfers came from a bank account of APPCO other than the trust
account.  Neither argument is valid as a matter of law.  As to the former assertion, the fact that TEL
terminated APPCO's authority to prospectively sell lottery tickets and retrieved the unsold tickets
in no way destroyed the trust status of proceeds from prior lottery ticket sales.  These proceeds
remained the trust res, and APPCO continued to hold these proceeds in trust for the benefit of TEL,
even though APPCO's future authority to sell tickets had been revoked.  Similarly, the fact that
APPCO paid TEL from an account other than the trust account did not destroy the parties' trust

relationship, even though the parties' agreement directed that payment be made from the established trust account. As previously noted, the mere fact that a trustee violates its fiduciary duties does not destroy a trust relationship. Assuming the wired payments were payments of trust funds, they remained trust funds, regardless of whether they were ever deposited into or passed through a trust account.

In summary, this court concludes that the proceeds from the sale of lottery tickets constituted funds APPCO held in trust for the benefit of TEL. This conclusion, however, does not necessarily resolve the issue before the court. As stated by the Supreme Court in *Begier*, the fact that a debtor held trust funds is insufficient to answer the question of whether the *particular dollars* that the debtor paid to the alleged preference creditor were trust funds. *See Begier*, 496 U.S. at 62 (emphasis in original). Only if the creditor was actually paid with the trust funds has there been no transfer of property of the debtor and therefore no preference. *Id.*

APPCO maintains that in order for TEL to establish that it was actually paid with trust funds, it must trace the trust funds through APPCO's commingled accounts, citing, *inter alia*, *First Federal of Michigan v. Barrow*, 878 F.2d 912 (6th Cir. 1989). As explained by the Sixth Circuit Court of Appeals in that decision:

> Once the trust relationship has been established, one claiming as a cestui que trust thereunder must identify the trust fund or property in the estate, and, if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate.

*Id.* at 915 (quoting 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1988)).

Based on this statement of common law, the Sixth Circuit in *First Federal* affirmed a preference judgment against a group of mortgage companies who had argued that funds paid to them by the debtor had been held in constructive trust, but had otherwise failed to trace the trust funds through the debtor's commingled bank account. *Id.* According to the court:

> [H]aving asserted a constructive trust of which they were beneficiaries, the appellants assumed the burden of identifying the sums of their entitlements by tracing the trust funds through [the debtor's] commingled accounts. . . .

12

It is beyond peradventure that, as a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankruptcy estate must identify the trust fund in its original or substituted form.  In the instant case, appellants have not attempted to trace their funds beyond the deposits into the commingled [debtor] Central Account, which evidence, standing alone, is insufficient to support their constructive trust theory of recovery.   Since the purported constructive trust consisted of money, which had no extrinsic identifiable characteristics of its own, was initially deposited and commingled into the [debtor] Depository Account with unidentifiable funds received from innumerable and diverse other sources and daily redeposited and again commingled in the negative balance [debtor] Central Account, appellants' funds irretrievably lost their identity and "tracing" became a futile pursuit as a result of which the controversial payments here in issue became avoidable transfers within the meaning of 11 U.S.C. § 547(b).

*Id.* (citations omitted).

In the present case, APPCO relies on this discussion from *First Federal* in support of its argument that TEL's summary judgment motion must fail because it has failed to perform the required tracing to demonstrate that it was actually paid with trust funds.  However, a critical distinction between the facts in *First Federal* and the facts in the present case is that the first six alleged preferential payments made by APPCO to TEL were not made from APPCO's commingled bank account, but from a trust account specifically set up for TEL's benefit.  In light of this critical factual distinction, at least with respect to the first six payments, this court believes that the Sixth Circuit's decision in *Cannon* is more instructive.   *See Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838 (6th Cir. 2002).

In *Cannon*, a Tennessee real estate attorney maintained several escrow accounts to hold client funds in connection with the clients' real estate transactions.  The attorney subsequently began using the funds in the escrow accounts to pay various personal and business expenses, and later made numerous transfers from the accounts to a brokerage company in order to engage in commodities trading.  *Id*. at 844.  Upon experiencing significant losses from this trading, the attorney filed for bankruptcy relief under chapter 7 (and was subsequently disbarred and imprisoned after pleading guilty to numerous federal crimes).  *Id*. at 845.  His bankruptcy trustee sought to recover the transfers from the brokerage company as fraudulent transfers under § 548 of the Bankruptcy Code.  Although the bankruptcy court ruled in favor of the trustee, the district court

13

reversed, concluding that the transfers were not property of the debtor attorney, a necessary element of § 548. *Id.* at 847. The court of appeals affirmed on the same basis. *Id.*

In reaching this conclusion, the Sixth Circuit first recognized that the client escrow accounts were express trusts and the funds therein trust funds for which the debtor only possessed legal title with equitable title remaining vested in the clients. *Id.* at 850. The court observed that "[a]lthough Tennessee law generally treats claimants of an insolvent trust as general creditors rather than beneficiaries unless they trace their property among commingled funds," tracing was not necessary in the case before it because the alleged fraudulent transfers had been from the trust accounts. *Id.* at 850-51. And, while the debtor attorney had placed some of its personal funds into the trust accounts, thus commingling trust funds with non-trust monies, under common law trust principles these added personal funds were deemed to constitute trust funds because the debtor had made the deposits in order to repay some of the misappropriated funds. *Id.* at 851 (citing, *inter alia, Bogert's Trusts and Trustees* § 929 (2d ed. rev. 1984) (explaining that a trustee's later deposits of his own money into a trust account are presumed to be restitution for his stolen funds when the account is expressly labeled a trust account)). Consequently, the transfers in *Cannon* to the defendant from the trust account were not property of the debtor, subject to recovery as a fraudulent conveyance, even though no tracing had been demonstrated. *Id.* at 851-52.

A similar result was reached in *Suwannee Swifty Stores, Inc. v. Georgia Lottery Corp. (In re Suwannee Swifty Stores, Inc.)*, 266 B.R. 544 (Bankr. M.D. Ga. 2001), under facts more closely aligned with those of the present case. In that decision, the debtor sought to avoid under 11 U.S.C. § 549(a) postpetition lottery payments to the Georgia Lottery Corporation. In response, the defendant argued that the payments were trust funds rather than estate property and therefore not avoidable. As in the present case, the debtor's routine business practice was to initially commingle all of its revenue, including proceeds from lottery ticket sales, into a general account, even though Georgia law required retailers to deposit lottery proceeds in a separate trust account. Then, each week, the debtor would deposit into its trust account the amount needed to satisfy the Georgia Lottery Corporation's weekly sweep. *Id.* at 547. It was these post-petition sweeps by the Georgia Lottery Corporation out of the trust account that the debtor sought to avoid.

14

The bankruptcy court concluded that Georgia law created a statutory trust in favor of the Georgia Lottery Corporation in all proceeds from the sale of lottery tickets. *Id.* at 549 (citing Ga. Code Ann. § 50-27-21(a)). The court further concluded that it was unnecessary for the Georgia Lottery Corporation to perform any tracing to establish that it was actually paid with trust funds, citing, in part,[4] the common law presumption that a trustee is restoring a beneficiary's trust funds when it adds funds to a depleted trust account. *Id.* at 553 (citing *Bethlehem Steel Corp. v. Tidwell*, 66 B.R. 932, 942 (M.D. Ga. 1986)); *see also* Restatement (Second) of Trusts § 202 cmt. m (2011).

Applying *Cannon* and *Suwannee Swifty Stores*, along with the common law trust presumption applied therein, to the present case, this court concludes that payments from the Tennessee Lottery trust account to TEL were payments of trust funds rather than funds of APPCO even though no tracing has been demonstrated. By setting up the trust account to pull funds from APPCO's master account when it was drawn upon by TEL's weekly EFT sweep, APPCO in essence created a systematic, electronic means of restoring the trust funds that it should have been depositing in the trust account all along. This restoration of trust funds in the trust account is conclusively presumed to be trust funds, as the *Cannon* decision holds. *See In re Cannon*, 277 F.3d at 851-52. Accordingly, tracing is not necessary in this instance to establish that TEL was actually paid with trust funds. *Id.*; *see also Kupetz v. United States (In re Cal. Trade Technical Sch., Inc.)*, 923 F.2d 641, 647 (9th Cir. 1991) (restored funds in a trust account are not subject to the tracing requirement); *Flint Ink Corp. v. Calascibetta*, No. 06-2517, 2007 WL 2687415, *10-11 (D.N.J. Sept. 10, 2007)

---

[4] The primary basis of the court's ruling was the *Begier* decision, with the bankruptcy court concluding that it stood for the proposition that a voluntary payment, "regardless of its source," is conclusively presumed to be from the trust corpus. *Id.* at 552. In reaching this conclusion, the *Suwannee Swifty Stores* court cited *Begier's* description of a § 7501 Internal Revenue Code trust, a trust created in an "abstract amount" without regard to the source of the funds, and concluded that the statutory trust in lottery proceeds was the same type of trust. *Id.* at 553 (citing *Begier*, 496 U.S. at 66-67).

This court respectfully disagrees with this aspect of the *Suwannee Swifty Stores* decision. Like the trust in the present case, the trust in *Suwannee Swifty Stores* was not in an abstract amount without regard to source; rather the trust was in specific property from a particular source, proceeds from the sale of lottery tickets. *See* Ga. Code Ann. § 50-27-21(a) ("All proceeds from the sale of the lottery tickets or shares shall constitute a trust fund until paid to the corporation . . .").

15

(transfer from segregated account which contained express trust funds not subject to avoidance as preference even though debtor had commingled personal funds in the account); *Watts v. Pride Utility Constr. (Matter of Sudco, Inc.*), No. 05-1134, 2007 WL 7143065, *7 (Bankr. N.D. Ga. Sept. 27, 2007) (recognizing presumption that replenished funds are trust funds when deposited into a segregated trust account).  Because the first six alleged preferential payments to TEL were from the trust account, TEL is entitled to summary judgment on its claim that these payments could not be preferences because they were not property of the debtor.

With respect to the two payments that APPCO wired to TEL in January 2009, no common law presumption saves TEL from the tracing requirement because these payments were not made from the trust account but from an APPCO general account.  This conclusion is unaltered by the fact that the general account from which TEL was paid may have included some of TEL's trust funds.  As explained by the Sixth Circuit in *First Federal*, if a defaulting fiduciary combines trust money with his own funds in a non-trust account, makes withdrawals from the account, but later adds his own funds into the account, the added funds are not presumed to constitute trust funds.[5]  *See First Fed. of Mich.,* 878 F.2d at 916 (quoting 4 *Collier on Bankruptcy* ¶ 541.13); *see also* Restatement (Second) of Trusts § 202 cmts.j and o (2011); Restatement (First) of Restitution §§ 59 and 212 cmt. a (2011); *Bogert's Trusts and Trustees* § 929 (2011).  Rather, the trust is deemed dissipated except as to the account's lowest intermediate balance, and the trust claimant may assert an interest only in funds in which it can perform the necessary tracing.  *Id.*

In response to the tracing necessity, TEL makes three successive counter arguments: (1) *First Federal's* tracing requirement is limited to its facts, a constructive trust under Michigan law, and has no applicability to an express trust under Tennessee law; (2) under the Supreme Court's decision in *Begier*, rendered subsequent to *First Federal*, tracing is not required if the debtor made voluntary payments of trust funds; and (3) even if tracing is required, the undisputed evidence in this case

---

[5] There is a possible exception to this rule if it is demonstrated that the deposited funds were added for the express purpose of restoring the property previously misappropriated.  However, the mere fact that a deposit occurred does not raise an inference of an intention to make restitution, unless, as in *Cannon*, the commingling and redeposit took place in a trust account.  *See* Restatement (Second) of Trusts § 202 cmt. m (2011); Restatement (First) of Restitution § 212 cmts. a and c (2011); *Bogert's Trusts and Trustees* § 929 (2011); 90A C.J.S. *Trusts* § 740 (2012).

adequately traces the proceeds from the sale of lottery tickets through APPCO's bank accounts to TEL. Each of these arguments will be addressed in the order presented.

Turning first to TEL's initial argument that the tracing requirement is limited to constructive trusts under Michigan law, the court finds no merit. The language in *First Federal* regarding tracing in the context of commingled accounts in the name of the debtor is extremely broad, and there is no indication that the court of appeals intended to limit its applicability to constructive trusts. The Sixth Circuit Bankruptcy Appellate Panel in *Leet Electric* applied the tracing requirement recognized in *First Federal* to statutory trusts, concluding that its reasoning "applies with equal force" since funds from both types of trust become unidentifiable when commingled with non-trust funds in the debtor's account. *See In re R.W. Leet Elec., Inc.*, 372 B.R. at 853-54; *see also Lovett v. Homrich Inc. (In re Philip Servs. Corp)*, 359 B.R. 616 (Bankr. S.D. Tex. 2006) (recognizing that *First Federal's* tracing rule is equally applicable to express or statutory trusts). Similarly, *Begier* was a statutory trust case, with the Supreme Court observing that tracing is generally required under common law if a preference defendant paid from the debtor's commingled general account asserts that the payments were trust funds. *Begier*, 496 U.S. at 62.

Moreover, the tracing mandate appears to be grounded in federal law, in particular the Bankruptcy Code's "policy of equal distribution among similarly situated creditors." *See Danning v. Bozek (In re Bulliion Reserve of N. Am.)*, 836 F.2d 1214, 1218 (9th Cir. 1988) (court granted preference plaintiff summary judgment, noting that defendant had duty under federal bankruptcy law to trace express trust funds placed in the debtor's commingled account to the bullion received by the defendant); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3rd Cir. 1994) ("[W]e look to state law to determine whether the claimant has shown a trust relationship, but . . . we look to federal law to determine whether the claimant has traced and identified the trust funds."); *Wis. v. Reese (In re Kennedy & Cohen, Inc.)*, 612 F.2d 963, 965 (5th Cir. 1980) ("[I]t is a federal question whether a trust, whether express or constructive, which cannot be traced to specific assets, will attach to the creditors' general funds in bankruptcy."); *Elliott v. Bumb*, 356 F.2d 749, 754-55 (9th Cir. 1966) (concluding that state law with statutory trust could not override federal tracing requirement contemplated by the distributive provisions of the Bankruptcy Act); *Wadsen v. Fla. Dept. of Rev. (Matter of Wellington Foods, Inc.)*, 165 B.R. 719, 726 n.7 (Bankr. S.D. Ga. 1994)

17

(recognizing that tracing rules have long been applied as a matter of federal common law when a debtor or trustee commingled trust funds with other funds in the debtor's account). As stated by the Sixth Circuit in *First Federal* as justification for the federal tracing requirement, "the Bankruptcy Act of 1978 explicitly defined the order of creditor priority and declared the congressional intent of federal supremacy over declared but conflicting state law orders of priority." *First Fed. of Mich.*, 878 F.2d at 915.

Further, to the extent that state law is applicable, Tennessee law similarly treats claimants of an insolvent trust as general creditors rather than beneficiaries unless they can trace their property through commingled funds. *See In re Cannon*, 277 F.3d at 850 (citing *Bragg v. Osborn*, 248 S.W. 19 (Tenn.1923); *McDowell v. McDowell*, 234 S.W. 329 (Tenn. 1921)). Accordingly, the court rejects the assertion that the tracing requirement is limited to constructive trusts or that it has no application to trusts under Tennessee law.

TEL's second argument as to why it is not required to trace the payments received by it from APPCO's commingled general account to the trust funds collected by APPCO is the *Begier* decision. In *Begier*, the Court considered whether prepetition payments of withholding and excise taxes to the IRS from the debtor's operating account could be avoided and recovered as bankruptcy preferences. *Begier,* 496 U.S. at 56. The Court initially concluded that these taxes were statutory trust funds pursuant to a provision of the federal tax code, 26 U.S.C. § 7501, which states that "the amount of [trust-fund] tax . . . collected or withheld shall be held to be a special fund in trust for the United States." *Id.* at 61-62. The Court then noted that this conclusion was insufficient to answer the particular question presented in the case: whether the IRS was actually paid with the trust funds, since only if that fact were established would the transfers "escape characterization [under §547(b) of the Bankruptcy Code] as 'property of the debtor.'" *Id.* at 62. Because § 7501 gave no guidance on this issue, the Court looked to common law tracing rules, the same rules recognized in *First Federal*, but found them unhelpful in this "special context," since they were designed for a system in which particular property is identified as the trust res. *Id.* at 63-63. By contrast, "[a] § 7501 trust is radically different from the common-law paradigm" because it creates a trust in "an abstract 'amount'–a dollar *figure* not tied to any particular assets–rather than in the actual dollars withheld." *Id.* at 62 (emphasis in original).

Unable to find the answer in the statute or in common law principles, the Supreme Court turned to the legislative history of § 547 and § 541 of the Bankruptcy Code, the latter of which defines property of the estate. The Court noted that prior to the enactment of the Bankruptcy Code in 1978, the Court in *United States v. Randall*, 401 U.S. 513 (1971), had refused to permit a bankruptcy debtor to make postpetition payments of trust fund taxes to the IRS ahead of administrative expenses. Unhappy with this ruling, Congress addressed the issue in the 1978 Code by expressly providing in § 541 that property of the estate would not include property held in trust for another. In a House Report, one Congressman discussed the effects of the new statutory language on the rule established in *Randall*:

> [A] serious problem exists where "trust fund taxes" withheld from others are held to be property of the estate where the withheld amounts are commingled with other assets of the debtor. The courts should permit the use of reasonable assumptions under which the Internal Revenue Service, and other tax authorities can demonstrate that amounts of withheld taxes are still in the possession of the debtor at the commencement of the case.

H.R. Rep. 95-595, at 549 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6500.

The Supreme Court in *Begier* concluded that these same "reasonable assumptions" should apply to prepetition payments of trust-fund taxes to the IRS, but queried how extensive the "required nexus" between the trust and the payments should be. *Id.* at 66. The Court found the answer in the following House Report:

> A payment of withholding taxes constitutes a payment of money held in trust under Internal Revenue Code § 7501(a), and thus will not be a preference because the beneficiary of the trust, the taxing authority, is in a separate class with respect to those taxes, if they have been properly held for payment, as they will have been if the debtor is able to make the payments.

H.R. Rep. 95-595, at 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329.

Based on the foregoing, the Court held that "[t]he debtor's act of voluntarily paying its trust-fund tax obligation therefore is alone sufficient to establish the required nexus between the 'amount' held in trust and the funds paid." *Begier*, 496 U.S. at 66-67. Because the debtor in *Begier* had voluntarily paid its trust-fund tax obligation to the IRS, the Court held that it was unnecessary for the IRS to perform the common-law tracing in order to prevail in the preference action against it. *Id.*

19

In the present case, TEL cites *Begier* for the proposition that it, similarly, is not required to trace the payments it received to its trust funds, because APPCO voluntarily made the payments, thereby providing the required nexus. This court disagrees.[6]  The Supreme Court in *Begier* was focused solely on trust-fund taxes pursuant to § 7501 of the Internal Revenue Code for which common-law tracing principles could not be applied because the trust res as defined by statute was in an abstract dollar "*amount*" rather than specific property, the common-law paradigm.  In fact, the court even utilized the phrase "special context" to describe how the issue before it arose.  In contrast, the trust res in the present case is not in an abstract "amount."  As previously described, the trust res is identified both in the retailer contract and by statute as specific property: proceeds from the sale of lottery tickets and unsold tickets in the retailer's possession.  There was simply no indication in *Begier* that the Court was abandoning the traditional tracing rule in contexts outside of § 7501 trusts or for trusts which continue to fit within the common-law paradigm.  *See Wyle v. S&S Credit Co. (In re Hamilton Taft & Co.)*, 53 F.3d 285, 290 (9th Cir. 1995), *vacated as moot*, 68 F.3d 337 (1995) (observing that it should not "extend the holding in *Begier* more broadly than is necessary to accomplish its purposes when doing so necessarily undermines the Bankruptcy Code's core principle of equality of distribution among creditors" and that "[i]n the absence of any clear policy reason for extending *Begier*, we apply the common law of trusts"); *United States v. Borock (In re Ruggeri Elec. Contracting, Inc.)*, 214 B.R. 481, 486 n.3 (E.D. Mich. 1997) ("Almost without exception, the Bankruptcy Courts have interpreted the Supreme Court's reasonable assumptions test [in *Begier*] narrowly."); *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 432 B.R. 135, 156, 151 (Bankr. D. Del. 2010) ("The *Begier* Court deviated from the common law tracing rules not because it found them lacking" but "due to the unique facts and circumstances raised by the specific type of trust at issue in the case.  As such, the holding in *Begier* should be narrowly construed and the nexus test should only apply in cases where a court is faced with facts similar to those in *Begier*."); *Johnson v. Barnhill (In re Antweil)*, 154 B.R. 982, 987 (Bankr. D.N.M. 1993) ("*Begier* deals with a unique type of situation, a trust created for the benefit of the Internal Revenue Service.").

---

[6] Even if *Begier* applied, there is an issue of fact as to whether the two wired payments were truly voluntary, as they were made in response to TEL's demand letter.

Consistent with this conclusion, common-law tracing generally has continued to be required for alleged trust payments outside the trust-fund tax context.[7]  *See, e.g., Stoebner v. Consumers Energy Co. (In re LGI Energy Solutions, Inc.)*, 460 B.R. 720, 726 (B.A.P. 8th Cir. 2011) (utilities who had received payments from general account of debtors who provided utility management and billing services had to establish trust relation and trace funds to prevail in preference action); *In re R.W. Leet Elec., Inc*., 372 B.R. at 855 (prepetition payments from debtor's commingled account subject to avoidance absent tracing of funds held in statutory trust under state contractors act); *Daly v. Radulesco (In re Carrozzella & Richardson)*, 247 B.R. 595, 601 (B.A.P. 2nd Cir. 2000) (preference defendant had burden of tracing their payments to express trust res); *In re Catholic Diocese of Wilmington, Inc*., 432 B.R. at 158 (alleged beneficiaries of resulting trust bore burden of identifying and tracing trust funds if they have been commingled with non-trust funds in non-trust account); *In re Philip Services Corp.,* 359 B.R. at 628 (requiring tracing for commingled express trust funds under state contractor act); *but see In re Suwannee Swifty Stores, Inc.*, 266 B.R. at 552-53 (tracing not required under *Begier* to protect from avoidance under § 549 of the Bankruptcy Code unauthorized postpetition transfers by the debtor to the Georgia Lottery Corporation); *EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros, Inc.)*, 243 B.R. 231, 240 (Bankr. D. Del. 2000) (concluding that although *Begier* dealt with taxes, its holding applied equally to all constructive trust cases under § 541(d)).

Having confirmed that tracing is required, this court turns to TEL's final argument, that the requisite tracing is established by the undisputed evidence in this case.  As proof of tracing, TEL points out that APPCO's practice was to transfer local bank deposits, which included lottery proceeds, to its master account no. 957, and that in December 2008, APPCO transferred from this

---

[7] Most courts have limited *Begier* exclusively to § 7501 trust-fund taxes, although a few, including the Third Circuit Court of Appeals, have extended its holding to other types of trust-fund taxes.  *See, e.g., City of Farrell v. Sharon Steel Corp*., 41 F.3d at 98-99 (finding no significant distinction between § 7501 trust for federal withholding tax and trust created under Pennsylvania law for local income taxes, the court concluded that common law tracing rules did not apply).  This extension has been based in part on the language quoted in *Begier* from the House Report that: "The courts should permit the use of reasonable assumptions under which the Internal Revenue Service, *and other tax authorities*, can demonstrate that amounts of withheld taxes are still in the possession of the debtor at the commencement of the case."  *Begier*, 496 U.S. at 65 (quoting H.R. Rep. 95-595, at 549 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6500) (emphasis supplied).

master account sums totaling $1,853,726.36 to account no. 353.  It is from this latter account that APPCO wired the two wired payments totaling $297,634.87 to TEL on January 9 and 12, 2009.[8] According to TEL, this evidence demonstrates that the wired payments were trust funds.

The court disagrees.  The funds on deposit in master account no. 957 consisted of commingled trust and non-trust funds from which APPCO regularly paid its vendors and other creditors.  There is no evidence in the record that any lottery trust funds remained in the master account at the time of the transfer to account no. 353.  Because of the general nature of the two accounts, it is incumbent upon TEL to allocate the funds in the accounts between trust and non-trust monies utilizing the lowest intermediate balance test.  *See First Fed. of Mich.*, 878 F.2d at 916.  As explained by the court of appeals therein:

> The situation frequently occurs where trust funds have been traced into a general bank account of the debtor.  The following general principles have been applied. The bankruptcy court will follow the trust fund and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust fund.  But where, after the appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account.  In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subject to the equitable claim of the cestui que trust.  If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust.  This analysis may be referred to as the lowest intermediate balance test.

*Id.* (quoting 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1988)); *Old Republic National Title Insurance Co. v. Tyler (In re Dameron)*, 155 F. 3d 718, 723-24 (4th Cir. 1998) (courts resort to LIBT when trust funds are commingled with other funds in a general corporate account); *Greenwald v. Center Line Electric, Inc. (In re Trans-End Technology, Inc.)*, No. 97-6119, 1998 WL 542331, *6

---

[8] TEL also points out that in December 2008 APPCO transferred $1,853,726.36 from master account no. 957 to account no. 906, and then on January 12, 2009, transferred $247,634.87 from account no. 906 to account no. 353.  The relevance of this information is unclear since the transfer into account no. 353 occurred after the January 9, 2009 wire transfer to TEL and the evidence does not indicate whether the transfer of funds from account no. 906 to account no. 353 on January 12, 2009, took place before APPCO made the wired payment to TEL on January 12, 2009.

(Bankr. N.D. Ohio 1998) (court utilized the LIBT to determine whether alleged preferential payments out of debtor's commingled bank account were trust funds).

No attempt has been made by TEL to apply the lowest intermediate balance test to establish that it was actually paid with trust funds when it received the wired payments. Accordingly, TEL's motion for summary judgment based on its contention that the payments represented trust funds rather than property of the debtor must be denied.

In turn, APPCO seeks partial summary judgment on the same issue. APPCO maintains that because TEL received the wired  payments from APPCO's general account, and because TEL has not demonstrated by the required tracing with its lowest intermediate balance test that any of the payments represented trust funds, the court should summarily rule that the payments represented property of the debtor. Alternatively, APPCO contends that tracing is an impossibility because of the multiple accounts into which the lottery proceeds were commingled before payment to TEL.

The court agrees that APPCO is entitled to a ruling in its favor on this issue because TEL has failed to establish that it was paid with trust funds. As discussed in *Leet Electric*, although a party seeking to avoid a preference has the burden of establishing all of the elements of a preference under § 547(b), *see* 11 U.S.C. § 547(g), APPCO met this burden by evidence that TEL was paid from APPCO's general account. *See In re R.W. Leet Elec., Inc.*, 372 B.R. at 855-57. Faced with APPCO's properly supported request for partial summary judgment on the question of whether TEL was paid with property of the debtor, it was incumbent on TEL to come forward with evidence demonstrating the required tracing or otherwise suggesting that there is a genuine issue of material fact on this issue. *See id.* at 856 (citing, *inter alia, In re Carrozzella & Richardson*, 247 B.R. at 602 (once the trustee establishes that the creditor was paid from the debtor's commingled general account, the burden shifted to creditor to prove that debtor only had legal title and to trace its interest in the commingled funds)). TEL having failed to meet this burden, APPCO is entitled to partial summary judgment on its claim that the two wired payments were property of the debtor.

IV.

In summary, the court concludes that the six payments totaling $229,155.81 made by APPCO to TEL between November 13, 2008, and December 16, 2008, were trust fund property rather than property of the debtor.   Accordingly, TEL is entitled to summary judgment in its favor as to APPCO's claim that these payments represent avoidable preferences under 11 U.S.C. § 547(b). Regarding the two wired payments made by APPCO to TEL on January 9, 2009, and January 12, 2009, in the amounts of $50,000.00 and $247,634.87 respectively, the court concludes that these payments were property of the debtor APPCO.  Therefore, APPCO will be granted partial summary judgment on these claims, and TEL's motion for summary judgment will be denied.  The court will enter an order consistent with this ruling.

# # #